## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**RICHIE R. ROTH,** *D.C.***; CAROL CARSON,**                    **PLAINTIFFS**
*D.C.***; TYRHEE BURNETT,** *D.C.***; KOLTUR**
**EASTON,** *D.C.***; KARMEN FAUCETTE,** *D.C.***;**
**JOSE DE LA ROSA,** *D.C.***; TONY BARGER,**
*D.C.***; MARY MEEKER-PREGON,** *D.C.***;**
**RALPH BURTON,** *D.C.***; CANDICE**
**HOLT-MOORE,** *D.C.***; NATHAN RICHARDS,**
*D.C.***; TODD TALLEY,** *D.C.***; ALAN OSOWSKI,**
**and ARKANSAS HEALTH MANAGEMENT, INC.**

**v.**                     **Case No. 4:25-cv-00733-LPR**

**ELIZABETH JONES,** *in her official capacity*
*as the Director of the Arkansas State Board of*
*Chiropractic Examiners***; GREGORY UNGERANK,**
*D.C.***; JOSEPH LONG,** *D.C.***; HAROLD GUNTER,**
**SARAH HAYS,** *D.C.***; JACK MCCOY, MICHAEL**
**COURTNEY,** *D.C.***; TANYA HOLT,** *D.C.***;** *in their*
*official capacities as members of the Arkansas State*
*Board of Chiropractic Examiners***; and TIM GRIFFIN,**
*in his official capacity as the Attorney General of Arkansas*                    **DEFENDANTS**

## <u>ORDER</u>

This case concerns Act 309, a statute duly enacted in the 2025 Regular Session of the State of Arkansas's 95th General Assembly.[1]  Among other things, Act 309 curtails the ability of chiropractors and their agents to solicit business from individuals that have been involved in an accident, disaster, or other injury-causing event.[2]  The law passed both houses of the General Assembly with overwhelming, bipartisan majorities and was then signed by the Governor.[3]

---

[1] Compl. (Doc. 1) ¶¶ 26–32.

[2] *Id.* ¶ 33; *see also* Ark. Code Ann. § 17-81-107(i).

[3] *See* Compl. (Doc. 1) ¶ 32 ("Arkansas Governor Sarah Huckabee Sanders signed Act 309 into law on March 18, 2025 . . . ."); *House Vote – Wednesday, March 12, 2025 1:52:33 PM*, ARK. STATE LEGISLATURE, https://arkleg.state.ar.us/Bills/Votes?id=HB1405&rcs=526&chamber=House&ddBienniumSession=2025%2F2025R (last visited Aug. 18, 2025); *Senate Vote – Tuesday, March 11, 2025 3:20:53 PM*, ARK. STATE LEGISLATURE, https://arkleg.state.ar.us/Bills/Votes?id=HB1405&rcs=486&chamber=Senate&ddBienniumSession=2025%2F2025R (last visited Aug. 18, 2025); *House Vote – Monday, February 24, 2025 1:50:29 PM*, ARK. STATE LEGISLATURE,

Several months later, shortly before the law's effective date, thirteen individual chiropractors and one related business filed the instant case.[4]  They allege that Act 309—specifically the portion codified at Ark. Code Ann. section 17-81-107(i)—violates the First Amendment's Free Speech Clause and the Fourteenth Amendment's Equal Protection Clause.

Along with filing their Complaint, Plaintiffs have asked the Court to preliminarily enjoin Act 309 during the pendency of this lawsuit.[5]  Obtaining a preliminary injunction is—and should be—a tall order in any case.  After all, such relief is generally considered extraordinary.[6]  And this characterization is even more apt when the requested preliminary injunction would prevent the enforcement of a statute enacted by the democratically elected and democratically accountable branches of government.[7]  It is one thing to enjoin such a law—which reflects the will of the people—after a full judicial process leaves the Court with the firm conviction that the law conflicts with a part of the Constitution.  It is quite another thing to do so at the outset of a case, before the parties can fully develop the facts, and thus based on what amounts to a judicial guess as to whether the law is unconstitutional.  In considering requests to preliminarily enjoin duly enacted state or

---

https://arkleg.state.ar.us/Bills/Votes?id=HB1405&rcs=321&chamber=House&ddBienniumSession=2025%2F2025R (last visited Aug. 18, 2025).  It is not particularly surprising that the votes were bipartisan because the legislation was jointly sponsored by Senator Justin Boyd (a Republican) and Representative Jay Richardson (a Democrat). *See HB1405 –TO AMEND THE STATUTES CONCERNING PROCURERS; AND TO ADD ADDITIONAL REGULATIONS REGARDING THE USE OF A PROCURER BY A LICENSED CHIROPRACTIC PHYSICIAN*, ARK. STATE LEGISLATURE  https://arkleg.state.ar.us/Bills/Detail?id=HB1405&ddBienniumSession=2025%2F2025R  (last visited Aug. 18, 2025).

[4] *See* Compl. (Doc. 1) ¶¶ 1–14.

[5] *See generally* Mot. for Prelim. Inj. (Doc. 2).

[6] *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) ("A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" (quoting *Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 24 (2008))); *Winter*, 555 U.S. at 22 (characterizing injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief"); *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (characterizing preliminary injunctions as an "extraordinary" form of relief).

[7] *See Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–733 (8th Cir. 2008) (en banc).

federal laws, courts should proceed with the greatest caution, greatest humility, and greatest respect for the democratic process.[8]

The Eighth Circuit's caselaw reflects the foregoing principles.  Where the preliminary injunction of a federal or state law is at issue, the Eighth Circuit requires a heightened showing from the party moving for such relief:

> Ordinarily, the movant must show only a "fair chance" of success on the merits. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019).  But "where a preliminary injunction is sought to enjoin . . . government action based on presumptively reasoned democratic processes," the movant must show that "he is likely to prevail on the merits."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc).  State and federal statutes are the output of "presumptively reasoned democratic processes."  *Id*. at 732 & n.6.[9]

Accordingly, the most important question the Court must answer today is whether Plaintiffs have shown that it is more likely than not that they will be able to prove that Act 309 violates either the Free Speech Clause or the Equal Protection Clause of the United States Constitution.[10]

It is true that the framework used by the Eighth Circuit to analyze preliminary injunction requests includes factors other than the likelihood-of-success factor.[11]  But in cases like the one at bar, it would be extremely rare for those factors to cut the opposite way from the way the likelihood-of-success-factor cuts.  Consider, for example, the irreparable-harm factor.  Because the Eighth Circuit has held that suffering a deprivation of constitutional rights for any amount of time is an irreparable harm, a movant who has shown that a law more likely than not violates one or

---

[8] *See Rounds*, 530 F.3d at 732 (explaining that the heightened likelihood-of-success-on-the-merits showing required when challenging a duly enacted law "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly" (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995))).

[9] *Eggers*, 48 F. 4th at 565.

[10] The Court acknowledges the Eighth Circuit's four-factor *Dataphase* analysis used for determining the propriety of a motion for preliminary injunctive relief.  *See Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  But in cases like the one at bar, that analysis typically hinges on the likelihood-of-success factor.

[11] *See Dataphase*, 640 F.2d at 113.

more of his constitutional rights has necessarily also shown that he is likely to suffer irreparable harm in the absence of a preliminary injunction.[12]  On the other hand, a movant who has failed to show that a law more likely than not violates one or more of his constitutional rights will often be unable to show that he is likely to suffer irreparable harm in the absence of a preliminary injunction.  Similarly, consider the balance of harms and public interest factors, which merge where (as here) state officials in their official capacities are the actors to be enjoined.[13]  And the state's quantum of harm is an important (though not dispositive) consideration at this point in the analysis.  In all but the most unusual of cases, a state would suffer significant harm if a court enjoined a law that was constitutional, but would suffer little harm if a court enjoined a law that was unconstitutional.[14]  It is thus very likely—although not absolutely certain—that the resolution of the likelihood-of-success factor dictates the resolution of the merged balance-of-harms-public-interest factor.

Given all this, the bulk of the Court's opinion focuses on whether Plaintiffs have shown that it is more likely than not that they will be able to prove that Act 309 violates either the Free Speech Clause or the Equal Protection Clause of the United States Constitution.  And, for the reasons set out below, the answer turns out not to be a clean "yes" or "no."  Ultimately, the Court concludes that (1) as to Act 309's 14-day restriction on post-motor-vehicle-accident solicitation by chiropractors, Plaintiffs have failed to show that they will more likely than not prove this restriction

---

[12] *See Ng v. Bd. Regents Univ. Minn.*, 64 F.4th 992, 998 (8th Cir. 2023); *Johnson v. Minn. Park and Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

[13] *Eggers*, 48 F.4th at 564–65.

[14] *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))); *see also Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012).

to be unconstitutional; and (2) as to the permanent restriction on solicitation by chiropractors of persons involved in all other accidents, disasters, or injury-causing events, Plaintiffs have succeeded in showing that they will more likely than not prove this restriction to be unconstitutional.  Consistent with this conclusion, and cognizant of the Supreme Court's emphasis on issuing injunctions that are no broader than absolutely necessary to provide complete relief to the plaintiffs in the case,[15] the Court will issue a preliminary injunction that prevents Defendants from enforcing the first paragraph of Ark. Code Ann. section 17-81-107(i) against Plaintiffs except as that paragraph regulates post-motor-vehicle-accident solicitations.

## I.      Section 17-81-107 as Amended by Act 309

Act 309 amends various sections of Ark. Code Ann. section 17-81-107.  Most notably, the Act adds subsections (i) and (j) to the statute:

> (i) A chiropractic physician, including his or her employee, agent, independent contractor, or procurer, shall not solicit an individual who has been involved in an accident, disaster, or other event that causes injury for the purpose of treating injuries that the individual sustained or may have sustained in the accident, disaster, or other event unless:
>
> > (1) The chiropractic physician has a family or prior professional relationship with the individual; or
> >
> > (2) The chiropractic physician solicits the individual more than fourteen (14) days after the date of the motor vehicle accident.
>
> (j) A chiropractic physician shall have solicited services if the chiropractic physician performs services on an individual who is referred by:
>
> > (1) A procurer registered under this section of the chiropractic physician; or
> >
> > (2) Any person who receives compensation from the chiropractic physician in consideration of referrals, regardless of the relationship between the referring person and the chiropractic physician.[16]

---

[15] *Cf. Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2257 (2025).

[16] Ark. Code Ann. § 17-81-107(i)–(j).

Act 309 also adds subsection (a)(3), which defines the term "solicit" in the context of section 17-81-107 to mean "the initiation of in-person communication, telemarketing communication, telephonic communication, text message communication, internet direct message communication, or any other electronic direct message communication, or any combination of communications, by a chiropractic physician, including by his or her employee, agent, independent contractor, or procurer."[17]

The plain language of the revised statute is clear. Generally, after an accident, disaster, or other injury-causing event, a chiropractor may not (himself or through a compensated intermediary) confront, call, text, direct message, or similarly contact an injured individual for the purpose of signing the individual up for treatment. But there are exceptions. The most important exception is that the restriction is lifted entirely after 14 days where the injury was caused by a motor vehicle accident (as opposed to some other accident, disaster, or injury-causing event). Additionally, the restriction does not apply at all if there was a pre-existing family or professional relationship between the chiropractor and the injured person (regardless of the cause of the person's injuries).

Defendants disagree with this interpretation of the statute. They assert that the Court should construe the phrase "accident, disaster, or other event that causes injury" in Ark. Code Ann. section 17-81-107(i) to mean only motor-vehicle accidents.[18] Their interpretation relies on a particularly strong form of the constitutional-avoidance canon, which they say the Arkansas Supreme Court endorses.[19] In a nutshell, Defendants seem to concede that, if the term "accident, disaster, or other event that causes injury" is broader than "motor vehicle accident," the Act likely

---

[17] Ark. Code Ann. § 17-81-107(a)(3).

[18] *See* Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 15–16.

[19] *See id.* at 15 (citing *Bowker v. State*, 363 Ark. 345, 355, 214 S.W.3d 243, 249 (2005)).

has serious constitutional infirmities because (1) a permanent ban on solicitation almost certainly violates the First Amendment and (2) the Act's ban on solicitations would be permanent with respect to all injurious events other than motor-vehicle accidents.  On the other hand, if "accident, disaster, or other event that causes injury" is interpreted to refer only to motor-vehicle accidents, then the Act doesn't permanently ban any solicitations.  Rather, the Act only bans solicitations for 14 days.

Defendants' argument can't make it out of the starting gate.  Their preferred interpretation is not reasonable, not plausible, and not even possible.  The phrase "accident, disaster, or other event that causes injury" cannot be described as anything other than extremely broad.  The phrase obviously covers more than motor-vehicle accidents because it obviously covers more than accidents.  Otherwise, the terms "disaster" and "other event that causes injury" are superfluous. Not even the strongest form of the constitutional-avoidance canon could justify the type of linguistic yoga that Defendants need the Court to perform in order to accept their statutory construction.[20]

---

[20] The Arkansas Supreme Court often says that its ultimate goal in statutory interpretation is to "give effect to the intent of the General Assembly." *Turnbough v. Mammoth Spring Sch. Dist. No. 2*, 349 Ark. 341, 346, 78 S.W.3d 89, 92 (2002).  But that general statement of law is a bit misleading.  Over and over again, the Arkansas Supreme Court has made clear that the principal consideration in statutory analysis is the text itself.  As that court puts it, the first step in determining legislative intent is construing the statute "just as it reads, giving the words their ordinary and usually accepted meaning in common language . . . so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible." *Id.* (citation omitted).  This textual analysis includes application of the linguistic (*i.e.*, non-substantive) canons. *See, e.g.*, *Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 135, at 7–10, 597 S.W.3d 613, 618–19 (using semantic and syntactic canons); *Pritchett v. City of Hot Springs*, 2017 Ark. 95, at 6, 514 S.W.3d 447, 451 (using semantic canons).  It is only if the statute's meaning is still unclear after this textualist analysis that the Arkansas Supreme Court turns to more purposivist considerations like "the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject." *MacSteel Div. of Quanex v. Ark. Okla. Gas Corp.*, 363 Ark. 22, 30, 210 S.W.3d 878, 882–83 (2005).  This latter category of considerations would include the substantive canons, such as the constitutional-avoidance canon. *See Biden v. Nebraska*, 600 U.S. 477, 508 (2023) (Barrett, J., concurring).

## II.    First Amendment Challenge[21]

There is a fair amount of agreement between the parties with respect to Plaintiffs' Free Speech Clause challenge.  The parties agree that Act 309 targets purely commercial speech.[22]  The parties agree that the *Central Hudson* framework governs the legal analysis.[23]  The parties agree that Act 309 targets speech that concerns lawful activity and is neither false nor misleading.[24]  Accordingly, Act 309's solicitation restrictions outlined in Section I above survive First Amendment scrutiny only if the government can meet the following test: (1) "the government must assert a substantial interest in support of its [law];" (2) "the government must demonstrate that the restriction on commercial speech directly and materially advances that interest;" and (3) "the regulation must be narrowly drawn."[25]

---

[21] Technically, the title of this section should be First Amendment Challenges.  Plaintiffs have brought both a facial and an as-applied challenge under the Free Speech Clause.  *See* Compl. (Doc. 1) ¶¶ 69–76.  For clarity, however, the Court will address this wrinkle in a later section of today's Order.

[22] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 11 ("Act 309 unconstitutionally infringes upon Plaintiffs' commercial speech."); Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 1 ("Act 309 regulates commercial speech.").

[23] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 11 (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)); Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 6 (same).

[24] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 11; Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 7.

[25] *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (citation and quotation omitted).  The Court is bound—by both Supreme Court and Eighth Circuit precedent—to apply the *Central Hudson* framework.  *See Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 653 (8th Cir. 2003) ("[T]he Supreme Court has recently indicated that *Central Hudson* remains the test for the constitutionality of a restriction on commercial speech.").  And the Court will do its duty dispassionately.  Still, the Court can't help but note the Alice-in-Wonderland feel of all this.  In pertinent part, the First Amendment states that "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. CONST. amend. I.  The only legitimate legal question here would thus seem to be whether, at the founding, the phrase "the freedom of speech" included purely commercial speech.  If it did, the government should not be able to abridge such speech.  If it did not, the government should be able to abridge such speech.  But instead of this legal inquiry, the Court is called upon to apply a mushy, judge-made balancing test that (1) bears no logical relation to the language of the First Amendment and (2) risks encouraging courts to sit as super-legislators.  *See infra* pp. 19–20.

For the first 180 years of our republic, purely commercial speech was not protected by the First Amendment.  *See Went For It*, 515 U.S. at 622 (citing *Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942)).  Put another way, for most of American history, purely commercial speech was understood to fall outside "the freedom of speech" that the First Amendment protected from abridgement.  Starting in the mid-1970s, however, the Supreme Court elevated purely commercial speech to quasi-constitutional status.  *See, e.g.*, *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Couns., Inc.*, 425 U.S. 748, 762 (1976); *Bigelow v. Virginia*, 421 U.S. 809, 825–26 (1975).  It did so despite acknowledging that (1) purely commercial speech is something different than the "speech at the First Amendment's core" and (2) purely commercial speech has a "subordinate position in the scale of First Amendment values . . . ."  *Went For It*, 515 U.S. at 623 (quoting *Bd. Tr. State Univ. N.Y. v. Fox*, 492 U.S. 469, 480 (1989)).  To take account of

The *Central Hudson* framework amounts to an intermediate-scrutiny test that is best understood in juxtaposition to strict scrutiny and rational basis scrutiny. Let's start with the requirement that the government must assert a substantial interest. The Supreme Court has explained that "[u]nlike rational basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions."[26] In other words, the Court must limit itself to analyzing the exact interest (or interests) proffered by Defendants. The Court must then ask if that interest (or any of those interests) qualifies as a substantial interest.

But what is a substantial interest? Apparently, it is an interest that is more than merely legitimate but less than compelling. How does a judge decide whether a state's interest is substantial in a manner that does not rely on his or her own policy views about what is important and what is not? No one really knows. But, thankfully, the Court need not worry too much about that question in this case—because of binding Supreme Court precedent on the substantiality of Defendants' asserted interest. (More on that later.)

The second requirement of the *Central Hudson* test is that the government must demonstrate the challenged restriction on commercial speech directly and materially advances at least one proffered substantial interest. Under this prong, "a governmental body . . . must demonstrate that the harms it recites are real and that [the] restriction will in fact alleviate them to a material degree."[27] Although a critical component of the *Central Hudson* test—and an essential

---

what it apparently recognized as an exercise in constitution-stretching, the Supreme Court came up with a watered-down test for scrutinizing commercial speech. And it is this watered-down test that opens the door to judicial policymaking. What a tangled web we weave when first we practice to invent quasi-constitutional rights. In an appropriate case, the Supreme Court should consider whether the First Amendment, as its language was originally understood, protects purely commercial speech. And, if such speech is protected as a matter of the First Amendment's original public meaning, the Supreme Court should revisit whether purely commercial speech should be less protected than political speech.

[26] *Went For It*, 515 U.S. at 624 (quoting *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)).

[27] *Id.* at 626 (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)).

distinction between intermediate scrutiny and rational basis scrutiny—this prong of the test is not a particularly high burden. Rather, the idea is simply to ensure that the government has something other than "mere speculation or conjecture"[28] to support its proffered interest—so we know that the regulation "targets a concrete, nonspeculative harm."[29]

The Eighth Circuit has explained that, to demonstrate the harms are real and will be alleviated by the challenged restriction, a government can use studies, data, anecdotes, history, consensus, simple common sense, or a combination of any of the foregoing.[30] No particular category of evidence is necessary. And evidence from any one category may be sufficient depending upon its content. Moreover, because we are at the preliminary injunction stage, the Court reviews the current, limited record evidence with an eye toward making a predictive judgment as to whether it is more likely than not that, at the end of this litigation (*i.e.*, after further factual development), Defendants will be able demonstrate that the harms Act 309 was designed to address are real and that Act 309 will materially alleviate them.[31]

The third and final requirement of the *Central Hudson* test is that the regulation be narrowly drawn. As to this requirement, the Supreme Court and the Eighth Circuit have been clear that "narrowly drawn" means something far less than "the least restrictive means."[32] Indeed, the Supreme Court and the Eighth Circuit have emphasized that "the least restrictive means test has

---

[28] *Id.*

[29] *Id.* at 629. The point is to check that the proffered interest is not just subterfuge masking a different (and insubstantial) purpose. Without this minimal requirement, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Edenfield*, 507 U.S. at 771.

[30] *See Missouri ex rel. Nixon*, 323 F.3d at 654 (quoting *Went For It*, 515 U.S. at 628).

[31] *Cf. Starbucks Corp.*, 602 U.S. at 363 (Jackson, J., concurring in part, concurring in the judgment, and dissenting in part) (characterizing "the typical preliminary injunction context" as one where the district court makes "a predictive judgment about how it will [ultimately] rule on the merits").

[32] *Went For It*, 515 U.S. at 632; *Missouri ex rel. Nixon*, 323 F.3d at 658–59.

no role in the commercial speech context."[33]  Instead, all that is required is a reasonable fit between the legislature's ends and the means chosen to accomplish those ends:

> What our decisions require . . . is a "fit" between the legislature's ends and the means chosen to accomplish those ends[,] . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means, but . . . a means narrowly tailored to achieve the desired objective.[34]

Still, the fit requirement is not as lax as it would be in rational basis review.  For example, as the Supreme Court has explained in cases applying *Central Hudson*, "the existence of 'numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . is certainly a relevant consideration in determining whether the "fit" between the ends and means is reasonable.'"[35]

### A.  The Permanent Ban

With the above legal framework in mind, the Court now evaluates whether it is more likely than not that (at the end of the case) Plaintiffs will prevail on their First Amendment challenge. The Court begins with the solicitation restrictions applicable in the aftermath of an accident, disaster, or other injury-causing event that is not a motor-vehicle accident.  And the Court has little trouble predicting that Plaintiffs are more likely than not to prevail on their First Amendment challenge to such restrictions.

First, it is not even clear that Defendants are asserting a substantial interest in these restrictions.  On page 3 of their brief, Defendants clearly state that "Act 309 is aimed at protecting

---

[33] *Went For It*, 515 U.S. at 632; *Missouri ex rel. Nixon*, 323 F.3d at 658–59.

[34] *Went For It*, 515 U.S. at 632 (quoting *Fox*, 492 U.S. at 480) (cleaned up).

[35] *Id.* (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)).

the peace and privacy of car accident victims within the first 14 days after an accident."[36]  On page 14 of their brief, Defendants again characterize their interest as "[p]rotecting the peace and privacy of accident victims within the first 14 days after an accident."[37]  Because we know the 14-day window only applies to motor-vehicle accidents, this must be describing an interest related to post-motor-vehicle-accident solicitations.[38]  It is true that, parroting the language of Act 309, Defendants' brief also alludes to a broader "interest in protecting the privacy of individuals who have 'been involved in an accident, disaster, or other event that causes injury.'"[39]  But Defendants simultaneously argue that the "accident, disaster, or other event that causes injury" language means "motor vehicle accident."[40]

Overall, the best read of Defendants' brief is that it is only asserting an interest in the peace and privacy of victims of recent motor-vehicle accidents.  And nothing Defendants said at the preliminary injunction hearing suggested otherwise.  Without asserting an interest in support of restricting solicitations in the aftermath of a non-motor-vehicle accident, disaster, or other injury-causing event, Defendants cannot possibly justify that portion of Act 309 under *Central Hudson*.

In any event, even if Defendants had asserted the appropriate interest and even assuming the interest's substantiality, it is more likely than not that Defendants would fail the second and third prongs of the *Central Hudson* test.  As to the second prong, there is no record evidence that chiropractors or persons acting on their behalf are systematically and actively soliciting anyone

---

[36] Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 3.

[37] *Id.* at 14.

[38] The same is true of Defendants' characterization of their interest on page 12 of their brief: "protecting the peace and tranquility of accident victims immediately following an accident."  *Id.* at 12.

[39] *Id.* at 8 (quoting Ark. Code Ann. § 14-81-107(i)).  Defendants also characterize their interest as "protecting the peace and privacy of accident victims . . . ."  *See id.* at 13.

[40] *See id.* at 15–16.

other than motor-vehicle-accident victims.[41]  And there is no record evidence whatsoever of any complaints concerning chiropractors or persons acting on their behalf soliciting anyone other than motor-vehicle-accident victims.  No studies, no data, no anecdotes, no history, and no caselaw consensus.  Moreover, common sense suggests that this is not a real problem.  The testimony at the preliminary injunction hearing made clear that the ability to systematically and actively solicit potential patients stems from the existence and availability of police reports.[42]  Police reports are ubiquitous when it comes to motor-vehicle accidents.  But most other accidents, disasters, and injuring-causing events seem unlikely to result in a police report that can be obtained and easily used to target a victim for solicitation.

As to the third prong of the *Central Hudson* test, the overwhelming judicial consensus appears to foreclose permanent bans on commercial solicitation—at least bans like Act 309. Except for perhaps unique circumstances not at issue in this case, permanent bans on commercial speech (that is not false, not misleading, and concerns a lawful transaction) are not a reasonable way to achieve a state's interest in an injured person's peace, privacy, and tranquility.[43]  After all, at some point after the accident, disaster, or injury-causing event, the injured person just becomes a person.  At that point, the state's interest in protecting the person's privacy is not substantial enough to justify further restrictions on chiropractic solicitation.

---

[41] *See, e.g.*, Aug. 11, 2025 Hr'g Tr. (Rough) at 56 (Mr. White testifying that "99 percent" of patients obtained by Arkansas Health Management clinics via solicitation by procurers were involved in motor-vehicle accidents).

[42] *See id.* at 48.

[43] *See Speaks v. Kruse*, 445 F.3d 396, 401–02 (5th Cir. 2006); *Silverman v. Summers*, 28 Fed. App'x 370, 374–75 (6th Cir. 2001); *Bailey v. Morales*, 190 F.3d 320, 324 (5th Cir. 1999); *Culpepper v. Arkansas Bd. Chiropractic Exam'rs*, 343 Ark. 467, 477, 36 S.W.3d 335, 341 (2001).

Long story, short: Plaintiffs have shown that it is more likely than not that they will succeed on their First Amendment challenge to Act 309's permanent ban on chiropractic solicitation of a person injured in a non-motor-vehicle accident, disaster, or other injury-causing event.

### B. The 14-Day Ban

Things are different for Act 309's 14-day ban on chiropractic solicitation of a person injured in a motor-vehicle accident. First, and perhaps most importantly, Defendants have asserted a substantial interest in protecting the peace and privacy of motor-vehicle-accident victims in the period immediately after the accident. The Court has already noted above the portions of Defendants' brief that proffer this interest.[44] And, for those that find such things relevant, it is worth noting that this proffered interest accords with the interests identified by the Act's sponsors.[45]

Precedents from the Supreme Court and persuasive authority from other courts leave no doubt that protecting the peace and privacy of such persons is a substantial state interest.[46] So we move on to the second prong of *Central Hudson*, still cognizant of the fact that the Court is supposed to use the current, limited record to predict whether it is more likely than not that, at the end of the case, Defendants will be able to demonstrate that the harms Act 309 was designed to address are real and that Act 309 will materially alleviate them.

There appears to be little dispute that, each year, tens of thousands of Arkansans are systemically and actively targeted for chiropractic solicitation immediately after they are injured

---

[44] *See supra* pp. 11–12.

[45] *See* Ark. S. Floor Sess. (Mar. 11, 2025) at 3:08:01 PM–3:10:05 PM, https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20250311/-1/30836?mediaStartTime=20250311150717.

[46] *See Went For It*, 515 U.S. at 625; *Edenfield*, 507 U.S. at 768–69, *First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 683; *McKinley v. Abbot*, 643 F.3d 403, 408 (5th Cir. 2011); *Capobianco v. Summers*, 377 F.3d 559, 562 (6th Cir. 2004); *Silverman*, 28 Fed. App'x at 374; *Bailey*, 190 F.3d at 323.

in a motor-vehicle accident. At the preliminary injunction hearing, Defendant Elizabeth Jones, the Executive Director of the Arkansas State Board of Chiropractic Examiners, testified that Arkansas has about 700 active licensed chiropractors, and that in total those chiropractors have tens of thousands of Arkansans as patients.[47] Jerry White, Chief Operations and Strategy Officer for Plaintiff Arkansas Health Management, testified that the chiropractors at clinics associated with AHM saw 4100 patients in 2022, 3900 patients in 2023, 4400 patients in 2024, and 2600 patients thus far in 2025.[48] Mr. White further testified that 99% of those patients were victims of motor-vehicle accidents and virtually all of them were solicited by procurers working for AHM.[49] And Mr. White testified that AHM's business model (and the industry standard) is to have procurers identify and solicit motor-vehicle-accident victims within days of the motor vehicle accident.[50]

Evidence that tens of thousands of Arkansans per year are being solicited immediately after being injured in a car accident goes a long way to confirming that the harm to the peace and privacy of recently injured motor-vehicle-accident victims is real. Common sense suggests that, in the days after involvement in a motor-vehicle accident, many victims desire peace and privacy as they heal, process a potentially traumatic event, consider all the physical, emotional, financial, and legal consequences of the accident, and assess their injuries and treatment options. And solicitations

---

[47] See Aug. 11, 2025 Hr'g Tr. (Rough) at 21 (examination by Plaintiffs' counsel) (Q: Thank you for that. Of those 700 that are active or . . . have been active over the last several years, would you agree that those chiropractors have as patients thousand[s] and tens[] of thousand[s] . . . of Arkansans? A: Yes. Q: Is it as much as hundreds of [thousands]? A: I could not say.).

[48] Id. at 56.

[49] See id.; see also Ark. Code Ann. § 17-81-107(a)(1)(A) ("'Procurer' means a person or entity who for pecuniary benefit procures or attempts to procure a client, patient, or customer by directly contacting the client, patient, or customer in person, by telephone, or by electronic means at the direction of, request of, employment of, or in cooperation with a chiropractic physician.").

[50] See id. at 48–50. Because each of the two chiropractor-Plaintiffs that testified at the preliminary injunction hearing were employed by clinics operating to procure a client under the AHM umbrella, it is not surprising they testified similarly to Mr. White concerning the centrality of procurer solicitation to their business model of getting clients who have been injured in a recent motor-vehicle accident. See id. at 67–69; id. at 85–86.

from multiple competing chiropractic procurers—each of whom has a huge financial incentive to sell treatment faster, harder, and more aggressively than the other guy—will intrude on that peace and privacy.[51]

This is especially true given the record evidence of how procurers actually solicit. Ms. Jones testified to receiving complaints that procurers will show up at injured persons' doors.[52] Mr. White testified that procurers for AHM make telephone calls.[53] And, as explained below, other record evidence shows procurers (1) repeatedly calling or texting potential patients, (2) trying to poach patients from other chiropractors, (3) following potential patients and then confronting them in public, and (4) pushing treatment on hesitant patients. Imagine a recently injured person having to deal with all this from not one, but multiple procurers just days after a motor-vehicle accident.

Unsurprisingly, the record includes evidence of real people with real concerns about real solicitations. Ms. Jones told the Court that the Board received 8–10 telephone complaints in 2023 and a similar number in 2024 concerning post-accident solicitation for chiropractic services.[54] These complaints were from individuals who (1) did not understand how the procurers obtained the complainants' personal information and (2) felt like their privacy had been violated by telephonic and door-to-door solicitation.[55]

There are also written complaints to the Board in the record.[56] Several pieces of information in those complaints bear mentioning. Consider the 2019 police report that anecdotally

---

[51] Generally, procurers earn $300-$500 per new patient signed up. *See id.* at 62.

[52] *See id.* at 41.

[53] *See id.* at 48.

[54] *See id.* at 41; Ex. 1 (Decl. of Elizabeth Jones) to Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12-1) ¶ 8. Plaintiffs concede that Ms. Jones's testimony about these complaints "was honest." *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 109.

[55] *See id.* at 41.

[56] Plaintiffs note that many of the written complaints to the Board are submitted by chiropractors complaining about the solicitation practices of competitor chiropractors. *See id.* at 141. But it is not clear why that matters if the complaints are nonetheless relaying information about patients who were solicited. Plaintiffs also note that many of

shows the cutthroat and invasive practices employed by chiropractic procurers.[57]  Two individuals who had recently been in a car accident were checking into the office of one chiropractor when they received a phone call from the procurer for a competing chiropractor.[58]  That second procurer was apparently waiting for the prospective patients outside the office of the first chiropractor, said something that made the patients angry enough to come outside, and then tried to poach the patients.[59]  The patients explained that they became confused about whether the two competing businesses were the same, waited for the police, and eventually went home without having received treatment from anyone.[60]

Or look at the 2019 complaint that discusses the feelings of a woman who was contacted by a procurer after a motor-vehicle accident.[61]  The woman was convinced to visit a chiropractor, but then became "very upset" about how much information the chiropractor had about her and the fact that she felt "lure[d] to their facility under false pretenses."[62]  And then there's a 2019 complaint concerning an individual in a motor-vehicle accident who kept receiving calls from a procurer even after telling the procurer she was already scheduled at another clinic.[63]  The

---

the complaints in the record were submitted by the same chiropractor.  *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 14.  But that is not true of the subset of complaints highlighted by the Court in today's Order.

[57] Ex. 2 (FOIA-Responsive Complaints) to Aug. 11, 2025 Hr'g at Complaint No. 4, p. 18.  The Court notes that while Plaintiffs submitted the complaints unearthed by their FOIA requests into the record at the preliminary injunction hearing as exhibits, these complaints are not yet available on the docket.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] Ex. 2 (FOIA-Responsive Complaints) to Aug. 11, 2025 Hr'g at Complaint No. 14, p. 17.

[62] *Id.*

[63] *Id.* at Complaint No. 14, p. 9.

individual recounts the procurer "insisting on me [coming to] where she works" and notes that the procurer "keeps bothering me."[64]

More recently, a 2023 complaint to the Board shows repeated attempts of procurers to poach individuals (shortly after they were injured in accidents) who were already receiving treatment from another chiropractor.[65]   The complaint notes that procurers have dangled the potential of up to $5,000 to injured individuals as an incentive to change chiropractors.[66]   The complaint also notes that procurers have "also gone as far as to call our patient to find out they were already scheduled at [the clinic], ask the patient when the appointment is, and then shortly before the appointment text the patient[']s phone 'confirming their appointment and the location they are to go to for the appointment' and then sending that patient the address of [another clinic], so that the patient would go there instead."[67]   Finally, the complaint quotes a post-accident patient as being "traumatized" by a procurer's repeated attempts to get him to change clinics.[68]

The record also includes a 2023 complaint to the Board that suggests the pushiness of procurers and the regret of patients who give in to their cajoling:

> After my wreck on November 4, 2022[,] I was contacted by Jamie Spickes.  She knew all my information, my situation, and made me verify the information before she told me any information.  She told me that I needed to be seen by a Chiropractic Clinic and that Rogers Health Group was the closest one to my location.  When I became resistant, she told me I needed to go and she set an appointment for me for the next day at 5 pm.  I arrived at the [appointment] (after getting reminder texts from Ms. Spickes).  At the appointment, my concerns were again quelled and I was told the insurance of the other driver would be covering everything and I would never be held responsible.[69]

---

[64] *Id.*

[65] Ex. 2 (FOIA-Responsive Complaints) to Aug. 11, 2025 Hr'g at Complaint No. 7, p. 9.

[66] *Id.*

[67] *Id.* at Complaint No. 7, p. 9–10.

[68] *Id.* at Complaint No. 7, p. 14.

[69] Ex. 2 (FOIA-Responsive Complaints) to Aug. 11, 2025 Hr'g at Complaint No. 9, p. 4.

According to the complaint, although the patient was regularly seen by the clinic over the following 6–8 weeks, she received little actual care, and the care she did receive was substandard.[70] The patient

> was left leaving this experience[] violated and like I was not given adequate care. It just seems like insurance fraud. After speaking to the director of Rogers Health [G]roup TODAY, 3 months after care, I was told my medical bills totaled $3,200. That is the first and only number I've been given from them and I wish [I] would've gone to a clinic that cared.[71]

And, finally, there's a 2024 opinion piece by Mike Masterson in the Arkansas Democrat-Gazette.[72] The piece retells the story of one procurer that, "about a week" after a motor-vehicle crash, "repeatedly contacted [the] victims, sometimes impersonating an insurance adjustor, in order to secure a return phone call and refer them to one of her chiropractors in exchange for a referral fee from them."[73] The piece also quotes a Fort Smith Attorney relating his knowledge that "some chiropractors" engage in this "ambulance chasing" conduct.[74]

Plaintiffs argue that the number of complaints Defendants have identified as having anything to do with the invasion of a patient's peace and privacy (as opposed to the use of unlawful sales tactics[75]) is extremely minimal compared to the tens of thousands of injured persons solicited by chiropractors and their procurers in the wake of motor-vehicle accidents.[76] But, especially at

---

[70] *Id.*

[71] *Id.*

[72] Ex. 8 (Masterson Article) to Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12-8).

[73] *Id.* at 2–3.

[74] *Id.* at 3.

[75] As a practical matter, it is not clear that the unlawful-sales-tactics problem can be neatly separated from the peace-and-privacy problem. Part of the reason why the solicitations at issue are so violative of injured persons' peace and privacy is because many of these solicitations—as shown in the record evidence discussed by the Court *supra*—involve (1) tactics that are aggressive, pushy, and possibly illegal, and (2) statements that are misleading or outright false. Even worse, an injured person may be subjected to a decidedly unpeaceful competition between several chiropractic procurers employing such tactics and such statements, with each procurer trying to outdo all others in speed and aggressiveness.

[76] *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 109–10.

this early stage of the litigation, courts should not be in the business of second-guessing the democratically-elected branches of government as to how many complaints are needed to establish that a problem is real enough to try to solve.  What we do know from the record is that (1) people were getting solicited after being injured in a motor-vehicle accident and (2) some of them were not happy about it.  Put another way, there was a "concrete, non-speculative harm" for the legislature to have addressed.[77]

Plaintiffs also argue that previous laws passed by the General Assembly and previous regulations enacted by the Board have already solved whatever solicitation problems may have existed in the chiropractic industry.[78]  The short answer to this argument is that those laws and regulations were passed at various times between 2013 and 2023.[79]  And there is evidence in the record—detailed above—that solicitation problems persisted through this period and still persist after 2023.  That past laws and regulations have reduced—even significantly reduced—some aspects of a problem does not mean the remaining aspects are less real or serious.

Here's the bottom line on the real-harm issue.  The Court is not definitively concluding that the foregoing is enough to satisfy Defendants obligation to demonstrate that the harms they recite are real.  Instead, the Court is saying that, based on the foregoing evidence, the Court predicts that Defendants will more likely than not be able to carry this burden at the end of the case.[80]  And it

---

[77] Moreover, Plaintiffs acknowledge that "[t]he vast majority" of the patients they solicit "are socio-economically disadvantage[d]."  *See id.* at 53.  These patients may not know the entity to whom they should complain.  And they may not want to spend the time necessary to complain.

[78] *Id.* at 108–09.

[79] *See id.* at 109.

[80] The Court acknowledges Plaintiffs' argument that the number of complaints has reduced substantially since the passage of the two previous attempts to regulate solicitation.  *See id.*; *see also* Ex. 1 (Decl. of Jerry White) to Mot. for Prelim. Inj. (Doc. 2) at 9, ¶ 11; Ex. 2 (Decl. of Richie Roth) to Mot. for Prelim. Inj. (Doc. 2) at 12, ¶ 12; Ark. H.R. Ins. and Com. Comm. Meeting (Feb. 19, 2025) at 10:23:35 AM–10:25:00 AM https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20250219/-1/30717?mediaStartTime=20250219102012.  According to Plaintiffs, the cited statements show there are no real

is beyond dispute that Act 309 will, to a material degree, alleviate the privacy-related harms noted above. A 14-day waiting period before chiropractors or their procurers can solicit individuals injured in motor-vehicle accidents gives those individuals a reasonable time period to heal, process a potentially traumatic event, consider all the physical, emotional, financial, and legal consequences of the accident, and assess their injuries and treatment options.

So we move on to the third prong of the *Central Hudson* test: whether the 14-day solicitation restriction in Act 309 is narrowly drawn to be a reasonable fit for the state's asserted interest. Compared to the last prong, this prong's analysis is fairly simple. The weight of authority suggests that, absent unique circumstances, a short-term ban on commercial solicitation is a reasonable (i.e., narrowly drawn) way to advance a state's interest in the peace and privacy of its injured citizens.[81] This is especially true where, as here, the temporary ban is limited to calls, texts, emails, and direct electronic messaging.[82] Act 309 does not prohibit immediate solicitation by direct physical mail.[83]

None of Plaintiffs' arguments persuade the Court that this case presents the type of unique circumstances that would render Act 309 "more extensive than necessary to serve" Defendants' interest in protecting the peace and privacy of motor-vehicle-accident victims in the aftermath of

---

privacy concerns left. But, based on the record as it stands now and simple common sense, the Court is more persuaded by Defendants' evidence than the far vaguer assertions proffered by Plaintiffs.

[81] *See, e.g.*, *Went For It*, 515 U.S. at 633; *First Choice*, 969 F.3d at 684; *McKinley*, 643 F.3d at 409; *Capobianco*, 377 F.3d at 563–64.

[82] *See* Ark. Code Ann. § 17-81-107(a)(3). The Supreme Court has held that direct physical mail is far less privacy-intrusive than the sort of door-to-door solicitation that chiropractic procurers sometimes engage in. *See Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 475–76 (1988). And it's easy to see why the same logic holds for the difference between direct mail and telephone calls. Common sense dictates that it is easier to ignore a physical piece of mail than an actual human aggressively talking on the other end of the line. And while a pushy solicitor can call or text as many times as they want in as short a period as they want, mail is generally only delivered once a day.

[83] *See* Ark. Code Ann. § 17-81-107(n)(1) ((n) This section does not prohibit: (1) Solicitation by targeted direct-mail advertising or other forms of written, radio, or television advertising, if the advertising does not involve coercion, duress, or harassment and is not false, deceptive, or misleading . . . .").

the accident.[84]  The Court takes each of Plaintiffs' arguments—that is, the substantial ones—in turn.

Plaintiffs' first argument focuses on the exception to the 14-day solicitation ban in circumstances where "[t]he chiropractic physician has a family or prior professional relationship with the individual" solicited.[85]  Plaintiffs say the 14-day solicitation ban is not narrowly drawn because this exception is not broad enough.[86]  Specifically, they criticize the exception's failure to cover "a dear friend, colleague, or romantic partner . . . ."[87]  Their point appears to be that there are no greater privacy concerns where a chiropractor solicits a dear friend, colleague, or romantic partner than exist where a chiropractor solicits a family member or prior patient.  And so a ban that prevents the solicitation of a chiropractor's dear friend, colleague, or romantic partner is overbroad.

This argument is not strong.  *Central Hudson*'s third prong does not require a perfect fit, but rather a reasonable one.  The ban at issue need not "represent[] the single best disposition," but instead "one whose scope is in proportion to the interest served . . . ."[88]  With statutes like the one at bar, there will always be line-drawing issues at the edges.  If soliciting a dear friend is excepted from the ban, then why not except just a regular friend or an acquaintance?  Some overinclusivity is tolerated in the world of *Central Hudson*.  The more important question is whether the overinclusivity is reasonable.  Here, it is.  The Court agrees with Defendants that exceptions for dear friends, colleagues, and romantic partners would be difficult to administer and would create a new set of definitional problems that Defendants are entitled to avoid:

---

[84] *Missouri ex rel. Nixon*, 323 F.3d at 658 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001)).

[85] Ark. Code Ann. § 17-81-107(i).

[86] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 19.

[87] *Id.* at 18; *see also id.* at 19.

[88] *Went For It*, 515 U.S. at 632 (quoting *Fox*, 492 U.S. at 480).

> Suppose that § [17-81-107(i)(1)]'s exception allowed chiropractors to solicit their "dear friends." Next suppose a chiropractor claims that an individual she solicited is a dear friend, but the solicited individual considers herself to be a mere acquaintance of the chiropractor and files a complaint with the Board regarding the solicitation. Such a situation would present more thorny issues than the exception would alleviate.[89]

Defendants' avoidance of such thorny issues does not undermine the reasonableness of the fit between Act 309 and Defendants' asserted interest in the peace and privacy of injured individuals immediately after a car accident.

Plaintiffs' next argument is that § 17-81-107(j)(2) renders the 14-day solicitation ban overbroad.[90] Plaintiffs contend that this subsection "creates liability" for a chiropractor "if [he or she] perform[s] services on an individual referred by anyone who receives compensation for such referral."[91] And this means that patient referral programs—where current patients get benefits like free sessions in exchange for referrals—would be subject to the same 14-day solicitation ban. The Plaintiffs' point seems to be that Defendants' interest in the temporary peace and privacy of motor-vehicle-accident victims is not implicated where a patient of a chiropractor refers her mom to that chiropractor a few days after her mom had a motor-vehicle accident.

This argument is stronger. But it still runs headlong into the Supreme Court's and Eighth Circuit's admonitions against requiring a perfect fit.[92] Subsection (j)(1) and (j)(2) are, in effect, anti-circumvention provisions. They ensure that chiropractors cannot get around subsection (i) by outsourcing solicitations to and financing solicitations by procurers or current patients. There is no doubt that there are going to be a few circumstances in which subsection (j)(2) prohibits solicitation

---

[89] Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 12–13.

[90] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 18.

[91] *Id.*

[92] *See Went For It*, 515 U.S. at 632; *Missouri ex rel. Nixon*, 323 F.3d at 659.

that does not implicate the peace-and-privacy concerns asserted by Defendants. But that slight overinclusiveness is, under *Central Hudson*, an acceptable price to pay to ensure the temporary solicitation ban is effective in the mine run of situations.[93] The bottom line is, just as in *Went For It*, Plaintiffs have not shown "numerous and obvious less-burdensome alternatives" to Act 309's 14-day temporary solicitation ban.[94] And, given what the Court has already said above, it is more

---

[93] *Cf. Went For It*, 515 U.S. at 633 ("Rather than drawing difficult lines on the basis that some injuries are 'severe' and some situations appropriate (and others, presumably, inappropriate) for grief, anger, or emotion, the Bar has crafted a ban applicable to all postaccident or disaster solicitations for a brief 30 day period. Unlike respondents, we do not see 'numerous and obvious less-burdensome alternatives' to Florida's short temporal ban. . . . The Bar's rule is reasonably well tailored to its stated objective of eliminating targeted mailings whose type and timing are a source of distress to Floridians, distress that has caused many of them to lose respect for the legal profession." (quoting *Discovery Network*, 507 U.S. at 417, n.13)).

It is unclear if Plaintiffs are also trying to contend that section 17-81-107(j)(2) takes away the (i)(1) exception (which allows a chiropractor to solicit family members and prior patients) where an individual was referred by a procurer or by someone who received compensation for the referral. To the extent Plaintiffs are making this argument, it is incorrect. All subsection (j) does is treat compensated referrals as solicitations by a chiropractor. Subsection (i)(1) still allows such solicitations with respect to a chiropractic physician's family members or past patients.

[94] *Went For It*, 515 U.S. at 633 (quoting *Discovery Network*, 507 U.S. at 417, n.13). In their briefing, Plaintiffs did not raise an underinclusiveness argument with respect to their First Amendment Free Speech challenge. That is, they did not argue that Act 309 fails the *Central Hudson* test because the State allows other health providers and insurance companies to solicit or otherwise contact motor-vehicle-accident victims within 14 days after the accident. *See generally* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 11–19; Compl. (Doc. 1) ¶¶ 62–76, 83–88 (raising underinclusiveness in the Equal Protection challenge but not the First Amendment challenge). This omission was conspicuous and intentional. Plaintiffs did raise the argument with respect to their Fourteenth Amendment Equal Protection challenge. *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 20–21. Moreover, in the Equal Protection portion of their briefing, they make clear that they knew they could raise the underinclusiveness issue for First Amendment purposes. *See id.* at 20 ("In *State Farm v. Conway*, the [Western District of Kentucky] found that a Kentucky statute was overinclusive under the First Amendment when it applied to professional license holders who were not shown to have engaged in abusive solicitation, but also that it was underinclusive under the Equal Protection Clause because it specifically carved out an exception for solicitation by insurance companies." (citation omitted)). In such circumstances, Plaintiffs should be considered as having forfeited the First Amendment underinclusiveness argument for purposes of the preliminary injunction hearing. *Cf. United States v. Olano*, 507 U.S. 725, 731 (1993) (stating that a right is forfeited if not timely asserted); *Bosch v. Thurman*, No. 22-cv-677, 2024 WL 841252, at *1 n.4 (E.D. Ark. Feb. 28, 2024) ("[T]he Eighth Circuit rule is clear: generally, a party gives up an issue if it fails to respond to the other side's summary judgment argument on that issue."). Admittedly, Plaintiffs raised the First Amendment underinclusiveness argument at the preliminary injunction hearing. *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 114–15. But that was after briefing closed.

In any event, there is incredibly meager record evidence that any other medical profession engages in post-motor-vehicle-accident solicitations of the type that Act 309 was aimed at preventing. *See id.* at 57; Ex. 1 (Decl. of Jerry White) to Mot. for Prelim. Inj. (Doc. 2) at 8, ¶ 8; Ex. 2 (Decl. of Richie Roth) to Mot. for Prelim. Inj. (Doc. 2) at 12, ¶ 6. And there is absolutely no evidence that any other medical profession does so at a scale that looks anything like what the chiropractic industry has been doing. Perhaps Plaintiffs will marshal such evidence as the case moves forward. But they have failed to show, at this point, that they are more likely than not to produce such evidence. And without that evidence, the underinclusiveness argument falls apart. In the *Central Hudson* context, a legislature does not fatally undermine the reasonableness of the means-end fit by restricting only existing, provable and significant sources of harms to a particular interest. Indeed, considering the evidence as it stands today, it is not even clear the

likely than not that Defendants will ultimately demonstrate that the means-end fit is reasonable (*i.e.*, narrowly drawn).

### C. Facial versus As-Applied Challenges

Plaintiffs have brought a facial First Amendment challenge and an as-applied First Amendment challenge.[95]    Based on the Court's foregoing analysis, Plaintiffs are unlikely to succeed on their facial challenge and likely to succeed on only a small part of their as-applied challenge.  Here's why.

In the First Amendment context, a plaintiff will not succeed on a facial challenge unless the plaintiff shows that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[96]    This means that "a law with 'a plainly legitimate sweep' may be struck down in its entirety" only if the plaintiff proves that "the law's unconstitutional applications substantially outweigh its constitutional ones."[97]

In our case, Plaintiffs have failed to show they will more likely than not meet this burden. Act 309 has a plainly legitimate sweep.  The Court has explained above that the 14-day ban on chiropractic solicitation of motor-vehicle-accident victims likely passes constitutional muster. And, as a practical matter, the 14-day ban is the bread and butter of Act 309.  Although Act 309's

---

government would be allowed to restrict the commercial speech of these other medical professions.  *See State Farm Mut. Auto. Ins. Co. v. Conway*, 13-CV-229, 2014 WL 2618579, at *13 (W.D. Ky. June 11, 2014).

The same point applies with respect to contacts by insurers after a motor vehicle accident.  But it is buoyed by another point as well.  Insurer contacts are different enough in kind from chiropractic solicitations that differential treatment between the two does not create a serious enough fit problem to sustain a constitutional challenge under intermediate scrutiny.  *See infra* p. 30.  *Central Hudson's* fit requirement is not so stringent that it prevents a state from reasonably concluding (as a legislative policy matter) that, unlike chiropractic solicitations, the benefits of insurer contacts outweigh the state's interest in an accident victims' peace and privacy.  This is especially true given the paltry state of the record concerning the extent of any privacy harm caused by insurer contacts.

[95] Compl. (Doc 1) ¶¶ 62–76.

[96] *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)).

[97] *Id* at 723–24.

permanent ban on chiropractic solicitation in the aftermath of an accident, disaster, or other injury-causing event that is not a motor-vehicle accident is very likely unconstitutional, the applications of this part of Act 309 do not substantially outweigh the applications of Act 309 to motor-vehicle accidents.  In fact, the opposite is true.  The record evidence suggests that the applications of Act 309 to motor-vehicle accidents substantially outweigh the applications of Act 309 to any other type of accident, disaster, or injury-causing event.[98]

That leaves Plaintiffs' as-applied challenge.  The Court agrees with Plaintiffs that they have standing to challenge both the 14-day ban and the permanent ban.  No one questions Plaintiffs' standing to challenge the 14-day ban.  But, for the reasons discussed above, Plaintiffs are unlikely to succeed in on the merits of that challenge.  As for the permanent ban, Defendants contend that Plaintiffs lack standing to challenge it.[99]  Defendants are wrong.  Plaintiffs provided testimony showing that they have customer referral programs and want to maintain them.[100]  These programs could make them liable if a customer were to refer a new patient who was injured in an accident, disaster, or other injury-causing event that was not a motor-vehicle accident.  And Plaintiffs provided testimony showing that some very small portion of their new patients are persons injured in events other than motor-vehicle accidents.[101]  So the referral issue is not a hypothetical.  Taken together, this is just enough for Plaintiffs to press the as-applied challenge to the permanent ban.  And, for the reasons noted above, Plaintiffs are likely to succeed on the merits of that challenge.

---

[98] *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 56; *see also infra* pp. 14–15.

[99] *See* Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 20.

[100] *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 49–50, 70, 87.

[101] *See id.* at 56.

### III.   Fourteenth Amendment Challenge

Because Act 309's permanent solicitation ban is likely to succumb to Plaintiffs' First Amendment challenge, the Court need not subject it to Plaintiffs' Fourteenth Amendment challenge at this juncture.  Rather, the Court's Equal Protection Clause analysis will focus on the Act's 14-day solicitation ban.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."[102]  Of course, the Clause "does not require that all persons be dealt with identically . . . ."[103]  According to the Supreme Court, "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose of another, with resulting disadvantage to various groups or persons."[104]

Under modern jurisprudence, what the Equal Protection Clause seeks to prevent is the arbitrary differential treatment of similarly situated people.  In most cases, that is accomplished by asking whether a plaintiff "has been intentionally treated differently from others similarly situated" and whether "there is [a] rational basis for the difference in treatment . . . ."[105]  That is, "if a law neither burdens a fundamental right nor targets a suspect class," courts should uphold "the legislative classification so long as it bears a rational relation to some legitimate end."[106]  On the

---

[102] U.S. CONST. amend. XIV, § 1.

[103] *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966).

[104] *Romer v. Evans*, 517 U.S. 620, 631 (1996).

[105] *Brown v. Kempker*, 55 Fed. App'x 388, 389 (8th Cir. 2002) (per curiam) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

[106] *Romer*, 517 U.S. at 631.

other hand, if "the [legislative] classification" burdens "a fundamental right" or "operates to the peculiar disadvantage of a suspect class," "equal protection analysis requires strict scrutiny."[107]

Plaintiffs and Defendants agree that Act 309 does not target a suspect classification.[108] Plaintiffs and Defendants also appear to agree that Act 309 is not burdening a fundamental right. Defendants clearly say so.[109]  Plaintiffs must agree, because they do not argue for the application of strict scrutiny.[110]  Instead, relying on a handful of Sixth Circuit cases, Plaintiffs contend that Act 309 should be subject to intermediate scrutiny in the Equal Protection context because it is subject to intermediate scrutiny in the First Amendment context.[111]

The problem with Plaintiffs' position—and, honestly, with the Sixth Circuit cases on which Plaintiffs rely—is that neither the Supreme Court nor the Eighth Circuit has ever applied intermediate scrutiny under its fundamental-rights line of Equal Protection cases.[112]  Either (1) a statute makes distinctions burdening a fundamental right and gets strict scrutiny, or (2) a statute's distinctions do not burden a fundamental right, and the statute is subjected only to rational basis

---

[107] *Massachusetts Bd. Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (per curiam).

[108] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 19–20; Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 16–17.

[109] *See* Resp. in Opp'n to Mot. for Prelim. Inj. (Doc. 12) at 17.

[110] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 19–20.

[111] *Id.*

[112] If anything, the Supreme Court suggests that the rational-basis test is the appropriate test for analyzing an Equal Protection challenge to a statute that restricts commercial speech.  *See Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 344 n.9 (1986) ("It should be apparent from our discussion of the First Amendment issue, and particularly the third and fourth prongs of the *Central Hudson* test, that appellant can fare no better under the equal protection guarantee of the Constitution.  If there is a sufficient 'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment, the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis." (citation omitted)), *abrogated on other grounds by 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); *see also Anderson v. Treadwell*, 294 F.3d 453, 464 (2d Cir. 2002) (applying rational basis scrutiny to an Equal Protection challenge to a restriction on commercial speech).  The Sixth Circuit's contrary conclusion seems to be based on its overreading of dicta from *R.A.V. v. St. Paul*.  *See Chambers v. Stengel*, 256 F.3d 397, 401 (6th Cir. 2001) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992)).  The dicta at issue suggests nothing more than that, where a fundamental First Amendment right is at issue, the Equal Protection analysis requires strict scrutiny and thus will overlap in significant ways with the First Amendment analysis.  *See R.A.V.*, 505 U.S. at 384 n.4.

review. And, as the parties seem to agree, commercial speech is not really a fundamental right. True, after nearly 180 years of no constitutional protection, the Supreme Court decided that commercial speech gets some First Amendment protection. But the Supreme Court has always been clear that commercial speech is not the type of speech "at the First Amendment's core."[113] And commercial speech therefore enjoys only "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values . . . ."[114] Whatever else one can say about commercial speech, it is not of the same vintage as rights that have been deemed fundamental in prior Supreme Court cases.[115]

So, we apply rational basis review. Do the legislative classifications created by Act 309 bear a rational relation to some legitimate end? The answer is clearly yes. The end here—temporary peace and privacy of injured persons following a motor-vehicle accident—is legitimate.[116] And the legislative classification—chiropractors (and their procurers) versus everyone else—bears a rational relationship to the peace and privacy of those recently injured in motor-vehicle accidents.

The record contains sufficient evidence of chiropractic procurers engaging in the sort of invasive and aggressive solicitation that is most likely to violate the peace and privacy of those recently injured in motor-vehicle accidents.[117] But the record contains practically no evidence of any other profession engaging in the same sort of (and amount of) solicitation of motor-vehicle-

---

[113] *Went For It*, 515 U.S. at 623.

[114] *Id.* (quoting *Fox*, 492 U.S. at 477).

[115] *See, e.g.*, *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (right to vote); *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969) (right of interstate travel), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (right to procreate).

[116] *See supra* p. 14.

[117] *See supra* pp. 16–19.

accident victims.[118]   So, on this record, it is more likely than not that the chiropractor/non-chiropractor distinction bears an obvious, rational relationship to Defendants' peace-and-privacy concern.

Plaintiffs argue that Act 309 is unlikely to pass constitutional muster because the Act does not regulate other medical professionals (*e.g.*, physical therapists, nurse practitioners, and physicians) and insurance companies alongside chiropractors.[119]   The implication is that this failure renders Act 309 fatally underinclusive.  But the argument is unavailing.  To say it again, there's practically no record evidence of other medical professionals engaging in the type and degree of solicitation targeted by Act 309's 14-day ban.  So, at least at this juncture, it is unlikely that Plaintiffs will be able to show that these other professionals are similarly situated to chiropractors.  Therefore, the failure to regulate them is unlikely to render Act 309 underinclusive or otherwise cause Equal Protection problems.

As for insurance companies, they are only "similarly situated" to chiropractors in the sense that they may want to contact the victim of a motor-vehicle accident in the days immediately following the accident.  Insurance companies' employees aren't medical professionals.  They don't treat injuries.  They're not like chiropractors in any meaningful sense.  And the legislature doesn't need to treat them as if they were.  The legislature could have all sorts of reasons for balancing insurer speech and victim privacy concerns in a different way than it balanced chiropractor speech and victim privacy concerns.  That's perfectly fine under rational basis review.

Accepting Plaintiffs' underinclusivity arguments would require the Court to ignore the Supreme Court's clear instruction that rational basis scrutiny is "a relatively relaxed standard" that

---

[118] *See supra* note 94.

[119] *See* Br. in Supp. of Mot. for Prelim. Inj. (Doc. 3) at 20–21.

recognizes that "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one."[120]  Indeed, the Supreme Court has recognized that "[p]erfection in making the necessary classifications is neither possible nor necessary."[121]  Simply put, there's nothing to indicate that this is the rare case where the Court should take the extraordinary step of finding that a statute (including the legislative classification it creates) bears no rational relationship to its asserted ends.  Plaintiffs are unlikely to succeed on the merits of their Equal Protection challenge to Act 309's 14-day solicitation ban.

## IV.    Other *Dataphase* Factors and Scope-of-Injunction Issues

The Court has already explained why, in a case like the one at bar, the remaining *Dataphase* factors nearly always cut in the same direction as the likelihood-of-success factor.[122]  Neither party has persuaded the Court that this case presents a special circumstance or special circumstances that would alter this typical result.  It is therefore clear to the Court that (1) Plaintiffs have met their *Dataphase* burden with respect to Act 309's permanent solicitation ban, but (2) Plaintiffs have not met their *Dataphase* burden with respect to Act 309's temporary solicitation ban.

What remains to be decided is the scope of the resulting injunction.  Two aspects of the injunction's potential scope seem to be non-controversial here.  First, only the Defendants (and their officers, agents, servants, employees, attorneys, and other persons acting in concert with such persons) should be enjoined.[123]  Second, the injunction can only run in favor of the actual Plaintiffs

---

[120] *Murgia*, 427 U.S. at 314.

[121] *Id.*

[122] *See supra* pp. 3–4.  Even assuming Plaintiffs have irreparable harm where a constitutional violation is not likely—because of their inability to recoup money from the state—they will not succeed in the *Dataphase* analysis where they cannot show a likelihood of success on the merits of their constitutional challenges to a duly enacted state statute.  *See Starbucks Corp.*, 602 U.S. at 346; *Winter*, 555 U.S. at 20; *Eggers*, 48 F.4th at 565; *Rounds*, 530 F.3d at 732.

[123] *See* Fed. R. Civ. P. 65(d)(2)(A)–(C).

in this case.[124]  A third aspect of the injunction's scope, however, is subject to a dispute.  Along with Defendants, the Court believes that only Act 309's permanent ban on chiropractic solicitation should be enjoined.[125]  That is, section 17-81-107(i) should be enjoined only in its application to the solicitation of individuals injured in accidents, disaster, or other injury-causing events that are not motor-vehicle accidents.  This reflects (1) the Court's conclusion that only application of Act 309 is likely unconstitutional and (2) the Court's understanding that a preliminary injunction—especially a preliminary injunction enjoining a duly enacted statute—should be as targeted and narrow as possible.[126]

Plaintiffs disagree.  They contend that the preliminary injunction should enjoin section 17-81-107(i) completely, including its application to the solicitation of individuals injured in motor-vehicle accidents.[127]  Of course, Plaintiffs' front-line reason for this contention is that even the 14-day solicitation ban (related to motor-vehicle accidents) is likely unconstitutional.  And that argument fails because the Court disagrees that that 14-day solicitation ban is likely unconstitutional.  But Plaintiffs' alternative reason for its contention is more interesting and deserves a somewhat fuller response.

Plaintiffs argue that enjoining only the 14-day solicitation ban would be tantamount to judicially rewriting the statute or to severing an inseverable statute.[128]  If so, the logic goes, the Court's actions would constitute a violation of separation-of-powers principles.  In support of this argument, Plaintiffs point out that Act 309 does not create two different bans: one permanent and

---

[124] *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 121.

[125] *See id.* at 122–23.

[126] *See CASA*, 145 S. Ct. at 2257.

[127] *See* Aug. 11, 2025 Hr'g Tr. (Rough) at 104–07.

[128] *See id.*

one temporary.[129]  Instead, according to Plaintiffs, Act 309 creates one permanent solicitation ban and then exempts from the ban solicitation of motor-vehicle-accident victims as long as 14 days have passed since the motor-vehicle accident.  Recall, Plaintiffs would say, how subsection (i) is structured:

> (i) A chiropractic physician, including his or her employee, agent, independent contractor, or procurer, shall not solicit an individual who has been involved in an accident, disaster, or other event that causes injury for the purpose of treating injuries that the individual sustained or may have sustained in the accident, disaster, or other event unless:
>
>> (1) The chiropractic physician has a family or prior professional relationship with the individual; or
>>
>> (2) The chiropractic physician solicits the individual more than fourteen (14) days after the date of the motor vehicle accident.[130]

Plaintiffs' point appears to be that because subsection (i) is written as a general permanent ban with an exception that relates to motor-vehicle accidents—as opposed to being written as two separate bans (one permanent and one temporary)—the Court can't artificially extract the temporary ban from the permanent one.  That is, even if the substance of subsection (i) cashes out as one permanent ban and one temporary ban, the form of subsection (i) prevents this type of statutory surgery.

Close, but no cigar.  At the preliminary injunction stage, especially where a facial challenge is not likely to succeed, courts cannot be said to be striking or voiding portions of a statute.  What courts are doing is temporarily preventing likely-unconstitutional applications of a statute against plaintiffs.[131]  The ban set out in the first paragraph of subsection (i) applies to accidents, disasters,

---

[129] *See id.* at 106–07.

[130] Ark. Code Ann. § 17-81-107(i).

[131] *Cf. Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (per curiam) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.  The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citations omitted)); *Benson Hotel*

and other injury-causing events.  This ban includes (but is certainly not limited to) motor-vehicle accidents.  And the Court has concluded that the ban is likely unconstitutional except as to motor-vehicle accidents.  So the Court is preliminarily enjoining some—but not all—of the potential applications of the ban in the first paragraph of subsection (i).

To be sure, the reason the motor-vehicle-accident application of the ban in the first paragraph of subsection (i) likely survives constitutional review is (primarily) the existence of subsection (i)(2).  But that is irrelevant to the real question: Can the Court preliminarily enjoin Defendants' enforcement against Plaintiffs of something less than all of the potential applications of the first paragraph of subsection (i)?  The Court believes that it can. Further, the Court believes that doing so does not run afoul of any known separation-of-powers principles.  And, finally, the Court believes that doing so is consistent with the Supreme Court's recent emphasis on narrow preliminary injunctions that disturb the actions of the democratically accountable branches of government only where those actions are or would be unlawful.[132]

\* \* \*

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction[133] is GRANTED IN PART and DENIED IN PART.  A preliminary injunction consistent with this Order will be issued.

---

*Corp. v. Woods*, 168 F.2d 694, 696 (8th Cir. 1948) ("The application for [a preliminary] injunction does not involve a final determination on the merits; in fact, the purpose of an injunction pendente lite is not to determine any controverted right, but to prevent a threatened wrong or any further perpetration of injury, or the doing of any act pending the final determination of the action whereby rights may be threatened or endangered, and to maintain things in the condition in which they are at the time and thus to protect property or rights from further complication or injury until the issues can be determined after a full hearing.").

[132] *Cf. CASA*, 145 S. Ct. at 2257.

[133] Doc. 2.

IT IS SO ORDERED this 20th day of August 2025.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE